## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

TERRI MORSE BACHOW, Individually on
Behalf of Herself and on Behalf of All Others
Similarly Situated,

              Plaintiff

         v.

SWANK ENERGY INCOME ADVISERS, LP,
SWANK CAPITAL, LLC, JERRY V. SWANK,
MARK W. FORDYCE, CPA, BRIAN R. BRUCE,
RONALD P. TROUT, and EDWARD N.
McMILLAN,

              Defendants.

C.A. No.  09-cv-262-K

## PLAINTIFF'S MOTION AND BRIEF IN SUPPORT IN SUPPORT OF
## CLASS CERTIFICATION

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

SUMMARY OF THE CLAIMS ........................................................................... 2

    A.    The Proposed Class Representative ........................................................ 2

    B.    Defendants ........................................................................................... 3

    C.    Statement of Facts ................................................................................ 3

ARGUMENT ..................................................................................................... 8

I.      THE STANDARDS FOR CLASS CERTIFICATION ..................................... 8

    A.    Securities Fraud Cases Are Particularly Well-Suited for Class Action Treatment ........................................................................................... 8

    B.    The Proposed Class Satifies the Requirements of Rule 23 ..................... 9

        1.    The Numerosity Requirement Is Satisfied ................................. 10

        2.    There Are Common Questions Of Law And Fact ....................... 10

        3.    Plaintiffs' Claims Are Typical Of Those Of The Members Of The Class ....................................................................................... 12

        4.    The Adequacy Of Representation Requirement Is Satisfied .................. 14

    C.    This Action Satisfies Rule 23(b)(3) ...................................................... 15

        1.    Common Questions of Law and Fact Predominate ..................... 10

            (a)    The Fund's Shares Were Activly Traded Throughout the Class Period .......................................................................... 23

            (b)    Securities Analysts Followed and Reported on the Fund ............ 23

            (c)    The Presence of Market Makers ................................... 23

            (d)    The Fund was Ineligible to file a Form S-3 ................................. 24

            (e)    There Was a Cause and Effect Relationship Between Unexpected News and the Movement of the Stock Price ................................. 24

(f)    Market Capitalization Facilitated an Efficient Market ................. 25

(g)    The Float Was Held by the Public As Opposed to Insiders.......... 25

(h)    The Bid-Ask Spread Was Consistent With an Actively Traded Closed End Mutual Fund ............................................................ 25

2.    A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action .................................................... 28

D.    The Court Should Appoint Co-Lead Counsel As Class Counsel ......................... 30

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

Cases

Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009).................... 22
Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997) ...................................................... 8, 16, 25
Barrie v. Intervoice-Brite, Inc., 2009 WL 3424614, at *7 (N.D. Tex. Oct. 26, 2009) ......... passim
Basic Inc. v. Levinson, 285 U.S. 224, 241-42 (1988)........................................................... 13, 17
Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 311-13 (5th Cir. 2005) ................................ 9, 18
Bertulli v. Indep. Ass'n of Cont. Pilots, 242 F.3d 290, 298 (5th Cir. 2001)................................ 16
Cooper v. Pacific Life Ins. Co., 229 F.R.D. 245, 257 (S.D. Ga. 2005) ....................................... 11
Durrett v. John Deere Co., 150 F.R.D. 555, 560 (N.D. Tex. 1993)............................................. 16
Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974).......................................................... 9
Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 139 (5th Cir. 2005)............................................... 8
Greenberg, 364 F.3d at 661............................................................................................................ 17
Hamilton v. First Am. Title Ins. Co., 2010 WL 1223125, at *3 (N.D. Tex. Mar. 29, 2010)... 9, 14,
   16
In re Enron Corp. Sec. Deriv. & "ERISA" Litig., 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006).... 8
In re Blech Sec. Litig., 187 F.R.D. 97, 104 (S.D.N.Y. 1999)....................................................... 11
In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981) ......................... 14
In re Energy Transfer Partners Natural Gas Litig., 2009 WL 2633781......................................... 23
In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403, 419 (S.D. Tex. 1999)............................ 9
In re Reliant Sec. Litig., No. H-02-2051, 2005 WL 2000707 (S.D. Tex. Aug. 18, 2005) ............. 2
In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 377 (S.D.N.Y. 2007) .......................... 4
In re Williams Sec. Litig.-WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009) ...................... 22
In re Xcelera.com Sec. Litig., 430 F.3d 503, 507 (1st Cir. 2005).................................................. 17
James v. City of Dallas, 254 F.3d 551, 570 (5th Cir. 2001) ......................................................... 10
Kalodner v. Michaels Stores, Inc., 172 F.R.D. 200, 204-05 (N.D. Tex. 1997) ............................ 12
Keasler v. Nat. Gas Pipeline Co. of Am., 84 F.R.D. 364, 368 (E.D. Tex. 1979) ......................... 24
Krogman v. Sterritt, 202 F.R.D 467, 479 (N.D. Tex. 2001).......................................................... 24
Lehocky v. Tidel Tech, Inc., 220 F.R.D. 491, 510 (S.D. Tex. 2004) .............................................. 8
Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir. 1997) ........................................... 12
Longden v. Sunderman, 123 F.R.D. 547, 551-558 (N.D. Tex. 1988) .............................. 8, 12, 24
Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999) ........................ 10, 16
Odmark v. Mesa Ltd. P'ship., 1992 WL 203541, at *2 (N.D. Tex. June 5, 1992)......................... 8
Oscar Private Equity Invs. v. Allegiance, 487 F.3d 261 (5th Cir. 2007).................................... 18
Oscar Private Equity Invs. v. Holland, No. 3:03-CV-2761, 2005 WL 877936 (N.D. Tex. Apr. 15,
   2005); 226 F.R.D. 559 (E.D. Tex. 2005)................................................................................. 2
Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985)........................................................... 8
Rifkin v. Crow, 80 F.R.D. 285, 286 (N.D. Tex. 1986)................................................................. 13
Rubenstein v. Collins, 162 F.R.D. 534, 537-38 (S.D. Tex. 1995)............................................... 13
Shaw v. Toshiba Am. Inf. Sys., Inc., 91 F. Supp. 2d 942, 958 (E.D. Tex. 2000)............................ 8
Stoffels v. SBC Comm., Inc., 238 F.R.D. 446, 454 (W.D. Tex. 2006).......................................... 14
Switzenbaum v. Orbital Scis. Corp., 187 F.R.D. 246, 248 (E.D. Va. 1999) ............................... 16
Watson v. Shell Oil Co., 979 F.2d 1014, 1022 (5th Cir. 1992) ..................................................... 10
Zeidman v. J. Ray McDermott & Co., 651 F.2d 1030, 1039 (5th Cir. 1981)................................ 10

## STATUTES

Federal Rule of Civil Procedure 23 ...................................................................................... <u>passim</u>

## PRELIMINARY STATEMENT

This is a class action under Section 10(b) of the Securities Exchange Act of 1934 brought pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons or entities, other than Defendants and their family members and affiliates, who acquired shares of the Cushing MLP Total Return Fund (the "Fund") on the New York Stock Exchange during the period from September 1, 2008, to December 19, 2008 (the "Class Period"). Lead Plaintiff Terri Morse Bachow and the other Class members were damaged by Defendants' knowingly or recklessly falsely overstating the Fund's net asset value ("NAV") by including an excessive and unwarranted accrual for prepaid taxes, known as a deferred tax asset. Based on eleven consecutive months – the Fund's entire history – of unprofitable operations, after a significant decline in the market, and after the Fund's auditor and tax advisor questioned the appropriateness of the tax accrual, Defendants knew or recklessly disregarded that the Fund was extremely unlikely ever to utilize the entire deferred tax asset. They falsely represented to the investing public that they had a reasonable basis to believe the Fund would utilize the entire tax accrual.

As demonstrated herein, this action easily satisfies all of the requirements of Rule 23 and is ideally suited for class certification pursuant to Fed. R. Civ. P. (23)(a) and (b)(3). The members of the Class are so numerous that joinder is impracticable. This action arises out of a common course of conduct by Defendants in which they publicly made materially false and misleading statements and omissions, such that questions of law and fact common to Plaintiff and the Class undoubtedly exist. Moreover, Lead Plaintiff's claims are typical of the claims of the Class in that they all seek to recover – based upon an identical legal theory – damages for losses sustained as a result of Defendants' material misrepresentations and omissions during the Class Period. Finally, there is no doubt that Lead Plaintiff Bachow will fairly and adequately

protect the interests of the Class and has retained experienced and highly qualified counsel to represent her and the Class.

As alleged in the Amended Complaint (the "Complaint"), pursuant to Rule 23(b)(3), questions of law and fact common to Plaintiff and the Class resulting from Defendants' common course of wrongful conduct predominate over any individual issues. Additionally, this is a prototypical securities class action, prosecution of which is unequivocally superior to individual actions that are not economically feasible for each member of the Class to bring on an individual basis. The class action is ideally suited to redressing the injuries incurred here and for preserving. Notably, courts in the Fifth Circuit routinely certify securities fraud cases for class action treatment. *See, e.g., Oscar Private Equity Invs. v. Holland*, No. 3:03-CV-2761, 2005 WL 877936 (N.D. Tex. Apr. 15, 2005); 226 F.R.D. 559 (E.D. Tex. 2005); *In re Reliant Sec. Litig.*, No. H-02-2051, 2005 WL 2000707 (S.D. Tex. Aug. 18, 2005). Accordingly, Plaintiff's Motion for Class Certification should be granted.

## SUMMARY OF THE CLAIMS

### A.    The Proposed Class Representative

Lead Plaintiff Bachow purchased shares of the Fund during the Class Period, and she has submitted a certification attesting to her standing to participate in this action based upon the individual damages she suffered as a result of Defendants' conduct. *See* Exhibit A to the Declaration of Mark C. Rifkin ("Rifkin Decl."), filed together herewith. Ms. Bachow was appointed Lead Plaintiff by an Order of the Court entered on April 20, 2009. As Lead Plaintiff, Ms. Bachow has supervised the vigorous prosecution of this litigation on behalf of the proposed Class, including conducting extensive investigation into Defendants' fraudulent schemes, preparing the Complaint, successfully defending against a motion to dismiss filed by Defendants, and propounding comprehensive discovery requests to Defendants and non-party witnesses.

### B.   Defendants

Swank Advisers is a limited partnership organized and existing under the laws of the State of Texas, with its principal place of business at 3300 Oak Lawn Avenue, Suite 650, Dallas, Texas 75219.   Defendants Swank Advisers is, and was throughout the Class Period, the investment adviser to the Fund and controlled the activities of the Fund.   Compl. ¶ 14.   Swank Capital, LLC ("Swank Capital") is a limited liability company organized and existing under the laws of the State of Texas, sharing a principal place of business with Swank Advisers.   Swank Capital is, and throughout the Class Period was, the general partner of Swank Advisers.   *Id.* ¶ 15.

Defendant Jerry V. Swank ("Jerry Swank") is, and was throughout the Class Period, a Trustee and Chairman of the Board, Chief Executive Officer, and President of the Fund, the Managing Partner of Swank Advisers, and the Principal of Swank Capital.   *Id.* ¶ 16; admitted at Answer ¶ 16..   Defendant Mark W. Fordyce, CPA ("Fordyce") is, and was throughout the Class Period, a Trustee of the Fund, the Fund's Chief Financial Officer, Principal Accounting Officer, Treasurer and Secretary, as well as Chief Financial Officer of Swank Advisers.   *Id.* ¶ 17; admitted at Answer ¶ 17.

### C.   Statement of Facts

The Fund is a closed-end mutual fund formed on May 24, 2007.   The Fund's shares are traded in an efficient market on the New York Stock Exchange.   Compl. ¶ 12-13; admitted in part at Answer ¶ 12.   Mutual funds, like the Fund, are valued periodically, with the NAV equal to the net difference between the closing value assigned to the assets and liabilities each day.   *Id.* ¶ 25.   Because shares of closed-end mutual funds, like the Fund, trade in the open market at prices that are closely in line with the funds' stated NAV, as a fund's stated NAV increases or decreases, the market price at which the fund's shares trade also rises or falls.   *Id.* ¶ 26.   The

3

market prices also reflect the expected dividend yield or other earnings on the funds' investments in the same manner, such that as the amount or percentage of assets invested increases or decreases, the market price at which the fund's shares trade likewise rises or falls. *Id.* ¶ 27. *See also* Expert Report of Candace L. Preston ("Preston Report"), ¶¶ 30,33, filed together herewith and incorporated by reference.   The NAV of any mutual fund – including the Fund – is exceedingly important to investors, since it closely relates to the prices at which the mutual fund's shares are traded and also serves as the basis for the advisory fees charged by and paid to such a mutual funds' investment advisers, like the fees received by Defendants in this case. *Id.*

On or about August 24, 2007, before the Class Period began, the Fund filed an amended Registration Statement on Form N-2 ("Prospectus") with the SEC signed by Defendants Swank and Fordyce.  Compl. ¶ 23; admitted at Answer ¶ 23.  According to the Prospectus, the Fund intended to obtain a high after-tax total return from investment in the energy infrastructure sector by investing primarily in the securities of master limited partnerships ("MLPs"), other equity securities, debt securities, and securities of non-United States issuers. *Id.*

The Fund was treated for federal and state income tax purposes as a "regular corporation, or a 'C' corporation," and accounted for income taxes pursuant to the provision of Financial Accounting Standards Board Statement No. 109 – Accounting for Income Taxes ("FAS 109"). Compl. ¶ 29.  FAS 109 allows an accrual for future tax liability, equal to the amount of loss in one accounting period that may be set off against gains (and the resulting tax obligation) in a subsequent accounting period.  *Id.*  A deferred tax asset arises "when a company will be able to benefit in future years by offsetting past tax losses against future taxable income. *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 377 (S.D.N.Y. 2007) (citing FAS 109 Summary).

The Fund claimed to be entitled to accrue the deferred tax asset in any year in which it incurred a loss, under the theory that the loss could be offset against future taxable earnings. Compl. ¶ 29.

Under Interpretation No. 48 – Accounting for Uncertainty in Income Taxes ("FIN 48"), an income tax asset may be accrued only when there is a high degree of confidence that the tax position will be sustained upon examination by a taxing authority. Compl. ¶ 30. If it is more likely than not that a portion of the tax benefits will not be realized, a valuation allowance is required to reduce the deferred tax asset. *Id.* ¶ 33. Thus, when it is proper to include some tax accrual, FAS 109 requires that the amount accrued must be "reduced . . . by the amount of any tax benefits that, based on available evidence, are not expected to be realized." *Id.* ¶ 30. FAS 109 also expressly provides, "[c]umulative losses in recent years" or "unsettled circumstances" that might adversely affect profits in the future, "make it 'difficult' to conclude that a tax valuation is *not* needed." *Scottish Re*, 524 F.Supp.2d at 377 (quoting FAS 109 ¶ 23).

Before and during the Class Period, (i) the Fund had a history of generating losses, not gains, (ii) the losses were other than temporary, and (iii) the cost or tax basis of the Fund's assets materially exceeded their fair values as of the beginning of the Class Period, all of which made it extremely unlikely that the Fund would realize the income necessary for it to use the deferred tax asset. Compl. ¶ 37. In addition, before and during the Class Period, a substantial portion of the Fund's investments were not liquid and it was not reasonable to believe that the Fund would earn capital gains or other profit from the disposition of those assets against which the deferred tax asset could be utilized, also making it extremely unlikely that the Fund would ever use the deferred tax asset. Compl. ¶ 38.

According to the Fund's Certified Shareholder Report on Form N-CSR ("Annual Report") filed with the SEC on February 2, 2008, during its initial accounting period, from

August 27, 2007, to November 30, 2007, the Fund reported a net operating loss of $ $5,145,428. The Fund's Semi-Annual Certified Shareholder Report on Form N-CSR ("Semi-Annual Report") filed with the SEC, on August 6, 2008, less than one month before the Class Period began, reported a net operating loss of approximately $4,914,000 and a capital loss of approximately $10,687,000 for the accounting period December 1, 2007, to May 31, 2008. Compl. ¶¶ 39 and 62; admitted at Answer ¶ 39. Thus, during its entire eleven-month period of existence before the Class Period began, the Fund never earned any profit and no one running the Fund could have reasonably believed that it would earn a profit in the foreseeable future. Compl. ¶¶ 37.

Despite these stark facts, Defendants caused or permitted the Fund to accrue an ever-growing, multi-million dollar deferred tax asset. By the time the Class Period began on September 1, 2008, the deferred tax asset had swelled to $7,008,739. Compl. ¶¶ 62 and 63.

Throughout the Class Period, the deferred tax asset was a material asset of the Fund, and at times during the Class Period, unbeknownst to the investment community, it was the single largest asset of the Fund. Compl. ¶ 49. The Complaint alleges that during this time, Defendants published (or caused the Fund to publish) "fact sheets" that falsely stated (i) the Fund's total assets, (ii) NAV per share, (iii) Swift Advisers' management fee, (iv) the Top Five Positions of the Fund, and (v) that the Fund invested at least 80 percent of its net assets in MLP investments. Compl. ¶ 69. As alleged in the Complaint: (i) the largest asset of the Fund, by far, throughout the Class Period was the overstated deferred tax asset, (ii) the NAV per share was significantly overstated by the improper deferred tax asset, (iii) Swift Advisers' management fee constituted a significantly higher percentage of the Fund's actual NAV, (iv) the top five positions of the Fund were less than actually stated, and (v) the Fund had not actually invested at least 80 percent of its net assets in the MLP investments. Compl. ¶ 70.

Beginning no later than September, 2008, the Fund and Defendants Swank and Fordyce were aware from discussions with the Fund's auditor, Deloitte & Touche USA LLP, or its tax advisor, Deloitte Tax LLP, or both (collectively "Deloitte"), of Deloitte's concerns regarding the appropriateness of the deferred tax asset. Compl. ¶ 50-52. Deloitte indicated that the deferred tax asset was not properly stated because the Fund had not established an adequate valuation allowance for the asset. Compl. ¶ 68.

By the end of the Class Period, the Fund's net assets had fallen precipitously from the amount of $223,765,671 first stated in the Semi-Annual Certified Shareholder Report to merely $90 million. Compl. ¶ 78. Concurrently, the deferred tax asset ballooned from approximately $7 million at the outset of the Class Period to $49.1 million by the conclusion. *Id.* This was never disclosed to investors during the Class Period. Compl. ¶ 50.

On December 19, 2008, the Fund to issued a press release announcing its determination to establish a valuation allowance to fully offset the deferred tax asset. Compl. ¶ 86. The announcement did not identify any new or changed information that the Fund or either Defendant received or considered. Compl. ¶ 87. The write-down of the entire amount of the deferred tax asset – which wiped out one-half of the Fund's reported NAV – contrasted starkly with the Fund's decision not to establish such a valuation allowance previously during the Class Period. Compl. ¶ 87. As a direct consequence of the Fund's stunning announcement, on December 22, 2008, the next trading day, the market price for Fund shares plummeted from $7.40 to $5.18 – a decrease of more than $2 per share. Compl. ¶ 90. By the end of the following trading day, December 23, 2008, the stock price declined even further, closing at $3.81. Compl. ¶ 90. This loss constituted an almost 50 percent drop in the market value of the Fund's stock over two days, roughly equaling the 50 percent decline in the Fund's stated NAV. Compl. ¶ 90.

## ARGUMENT

### I.   THE STANDARDS FOR CLASS CERTIFICATION

#### A.   Securities Fraud Cases Are Particularly Well-Suited for Class Action Treatment

The class action mechanism is especially appropriate in securities actions such as this. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "Class actions are particularly suited to cases involving alleged securities fraud because the number of potential class members is usually large even though the individual claims of many of the members are small." *Odmark v. Mesa Ltd. P'ship.*, 1992 WL 203541, at *2 (N.D. Tex. June 5, 1992); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (Class actions allow the "plaintiffs to pool claims which would be uneconomical to litigate individually").   Accordingly, courts in this Circuit have consistently recognized the utility of the class action device as an efficient and effective deterrent against securities law violations. *See, e.g., Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 139 (5th Cir. 2005); *Lehocky v. Tidel Tech, Inc.*, 220 F.R.D. 491, 510 (S.D. Tex. 2004).

When, as here, the complaint avers a common course of conduct damaging to a class of investors in violation of the federal securities laws, courts liberally construe the requirements of Rule 23 in favor of class certification. *See, e.g. In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006) (*citing Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988)).   Because the securities laws are complex and litigation relating thereto is expensive, in the absence of the class action mechanism, many wrongs deemed by Congress as actionable would go uncorrected and persons damaged thereby uncompensated. Indeed, in securities cases, "class certification . . . is practically routine." *Shaw v. Toshiba Am. Inf. Sys., Inc.*, 91 F. Supp. 2d 942, 958 (E.D. Tex. 2000).

Importantly, on a motion for class certification, "a preliminary inquiry into the merits is inappropriate"; rather, the court must only ascertain whether the requirements of Rule 23 are met. *See Hamilton v. First Am. Title Ins. Co.*, 2010 WL 1223125, at *3 (N.D. Tex. Mar. 29, 2010). *See also Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 311-12 (5th Cir. 2005) ("strength of a plaintiff's claim should not affect the certification decision") (quotation omitted); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) (question of whether a complaint has merit is independent of whether a class satisfies Rule 23). "The court does not have the authority to conduct a preliminary inquiry into the merits of the case, and hence the substantive allegations contained in the complaint are accepted as true." *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 419 (S.D. Tex. 1999). This case is prototypical for class treatment as it satisfies all prerequisites for class certification under Rule 23, and should proceed as a class action.

**B.** **The Proposed Class Satisfies the Requirements of Rule 23**

Rule 23(a) provides that an action may be maintained as a class action if each of four prerequisites is satisfied:

(1)    the Class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the Class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the Class; and

(4)    the representative parties will fairly and adequately protect the interests of the Class.

Fed. R. Civ. P. 23(a). In addition, under Rule 23(b)(3), the Court also must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Hamilton*, 2010 WL 1223125, at *3 (*quoting* Fed. R. Civ. P. 23(b)(3)).

### 1.      The Numerosity Requirement Is Satisfied

Under Rule 23(a)(1), the Class must be so numerous that joinder of all its members is impracticable.  Fed. R. Civ. P. 23(a)(I); *see Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992).  "Impracticable" does not equate to impossible, and the plaintiff need not establish the exact number of potential class members; a "reasonable estimate" of purported members is sufficient.  *Hamilton*, 2010 WL 1223125, at *4.  Moreover, in the Fifth Circuit, "the [numerosity] prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities."  *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981).

As alleged in the Complaint, on December 31, 2008, the Fund had approximately 9.5 million shares of stock outstanding.  Compl. ¶ 92.  Although the exact number of Class members can only be ascertained through appropriate discovery, because the Fund's securities traded on national exchanges during the Class Period, there are likely to be thousands of members of the Class located throughout the United States.  *See generally Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (noting that a class consisting of 100 to 150 members is within the "range that generally satisfies the numerosity requirement").  Additionally, it is probable that the members of the Class are geographically dispersed and so numerous such that joinder of all members is impracticable.  *Id.*  As such, numerosity is amply satisfied.

### 2.      There Are Common Questions Of Law And Fact

Under Rule 23(a)(2), commonality is met if there are questions of law or fact common to the class.  "The test for commonality is not demanding," such that "[a]ll that is required for each class is that there is one common question of law or fact."  *Hamilton*, 2010 WL 1223125, at *4 (*citing Mullen*, 186 F.3d at 625, and *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001)).  Significantly, "the interest and claims of the various plaintiffs need not be identical" if "at least

one issue [exists] whose resolution will affect all or a significant number of the putative class members." *Id.* That some members have unique claims or may require some individualized analysis does not defeat commonality. *James*, 254 F.3d at 570. In securities fraud litigation, the presence of a uniform scheme to defraud investors through material statements or omissions is held to satisfy the commonality requirement. *See, e.g., Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245, 257 (S.D. Ga. 2005); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999) (commonality requirement is applied permissively in securities fraud litigation).

The "common question" requirement is readily satisfied in this case. The Complaint alleges that Defendants, in a series of public statements and documents issued to the market during the Class Period, misrepresented and failed to disclose that they lacked any reasonable basis for accruing the entire deferred tax asset, and, even if they could have accrued some deferred tax asset, they had no reasonable basis for the inadequate valuation allowance reserved against it. *See, e.g.*, Compl. ¶¶ 55, 57, 66, 68; admitted at Answer ¶¶ 57 and 66. Here, the Complaint identifies numerous common issues of fact and law, all amenable to common proof through evidence of Defendants' conduct. These common issues include:

(a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)   whether Defendants considered all available evidence, both positive and negative, to determine that a valuation allowance was not needed for the deferred tax asset during the Class Period;

(c)   whether, given the Fund's history of generating net operating losses and capital losses (which may only be used to offset capital gains and cannot be used to offset ordinary income), and because the tax basis of the Fund's assets materially exceeded their fair values as of the beginning of the Class Period, Defendants had any reasonable basis to conclude that the Fund would realize the deferred tax asset;

(d)   whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the Fund's financial condition;

(e)    whether Defendants acted knowingly or recklessly in making materially false and misleading statements about the Fund's financial condition during the Class Period;

(f)    whether the market prices of the Fund's stock were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(g)    whether members of the Class have sustained damages as a result thereof and, if so, what measure of damages is proper.

Proof of these issues, which concerns Defendants' common course of conduct, will not vary appreciably from one Class member to another and will advance the claims of all Class members. The allegations thus amply satisfy the low commonality threshold of Rule 23(a)(2).

### 3.    Plaintiffs' Claims Are Typical Of Those Of The Members Of The Class

Rule 23(a)(3) requires a proposed class representative to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is met if the "other members of the class have the same or similar injury" as the proposed representative, if "the action is based on conduct not special or unique to the named plaintiffs," and if the "other class members have been injured by the same course of conduct." *Longden v. Sunderman*, 123 F.R.D. 547, 556 (N.D. Tex. 1988). "The test for typicality, like the test for commonality, is not demanding." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997) (citation omitted). Thus, even where class representatives' claims are not identical, "factual differences will not defeat typicality" so long as the claims arise "from a similar course of conduct and share the same legal theory," *Hamilton*, 2010 WL 1223125, at *8; *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 204-05 (N.D. Tex. 1997) ("Courts routinely find that similar legal theories satisfy [the typicality] requirement even where significant factual distinctions are present").

Lead Plaintiff Bachow's claims are plainly typical of those of the Class. As discussed in the "commonality" section above, Ms. Bachow alleges that she, like all putative Class members, purchased shares of the Fund, and subsequently suffered economic injury from Defendant's materially false and misleading statements and omissions concerning the true financial state of the Fund. Compl. ¶¶ 84-89. Lead Plaintiff's claims are typical as she seeks to recover damages caused by Defendants' singular common scheme and standardized fraudulent behavior, which was concealed from all Class members.

Furthermore, courts in this Circuit consistently reject arguments questioning typicality premised upon a plaintiff's individual sophistication, investment strategy, or reliance on other particulars surrounding the purchases of nationwide securities. *See, e.g.*, *Rubenstein v. Collins*, 162 F.R.D. 534, 537-38 (S.D. Tex. 1995) ("The various levels of sophistication . . . have no bearing on whether, they would have known in advance that an investment would materialize into a good or bad one.") Indeed, in a section 10(b) action, individual questions are irrelevant to typicality due to the rebuttable presumption of reliance stemming from the "fraud-on-the-market-theory." *Kalodner*, 172 F.R.D. at 205 (*citing Basic Inc. v. Levinson*, 285 U.S. 224, 241-42 (1988) (dispensing with the requirement that an investor must be personally aware of a particular misstatement prior to purchasing stock)). Pursuant to this theory, a rebuttable presumption exists "that the investor indirectly relied on the alleged misstatement by relying on the integrity of the stock price established by the market." *Id.* As this Court previously held in rejecting a challenge to typicality, "it makes no difference if you are the most or least knowledgeable investor in the market if facts are omitted or misrepresented in financial statements." *Rifkin v. Crow*, 80 F.R.D. 285, 286 (N.D. Tex. 1986).

Lead Plaintiff alleges injury similar or identical to the proposed Class caused by the same conduct by Defendants.  Accordingly, she satisfies the Rule 23(a)(3) typicality requirement.

### 4.     The Adequacy Of Representation Requirement Is Satisfied

Rule 23(a)(4) requires that the class representative will "fairly and adequately protect the interests of the class."  This requirement consists of two subsections:  (1) the representative party cannot have antagonistic or conflicting interest with the proposed Class, and (2) the representative party must vigorously pursue the litigation on behalf of the proposed Class, and its counsel must be qualified, experienced, and able to conduct the litigation.  *See, e.g., Hamilton*, 2010 WL 1223125, at *8.

As demonstrated in the discussion of commonality and typicality, Plaintiff's interests are not antagonistic to or in conflict with the interests of other Class members.  For a potential conflict to be sufficiently serious to defeat class certification, the conflict must rise above the speculative level.  *See Stoffels v. SBC Comm., Inc.*, 238 F.R.D. 446, 454 (W.D. Tex. 2006).  No cognizable antagonism exists here.  Plaintiff alleges that she, like all putative Class members, purchased shares of the Fund, and subsequently suffered economic injury from Defendant's materially false and misleading statements and omissions concerning the financial state of the Fund when the truth was revealed on December 19, 2008.  To establish Defendants' liability, Plaintiff will need to prove the same legal theory and standard course of conduct as the absent Class members.  As such, Plaintiff possesses the incentive to adequately and fairly represent all Class members to achieve the optimum recovery.  *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (unity in achieving the maximum possible recovery for the class demonstrates that "class interests are not antagonistic for representation purposes").

Furthermore, having suffered substantial monetary injury from Defendants' alleged securities law violations, Ms. Bachow is committed to vigorously prosecute this action.  In her

capacity as Lead Plaintiff, Ms. Bachow has actively monitored and consulted with lead counsel in the prosecution of this case. As further evidence of her adequacy to represent the Class, Ms. Bachow has retained counsel experienced in federal securities and class action litigation, and who possess the intellectual and financial ability and willingness to protect the interests of the Class. *See Barrie v. Intervoice-Brite, Inc.*, 2009 WL 3424614, at \*7 (N.D. Tex. Oct. 26, 2009) (approving of counsel due to prior experience as lead counsel in many securities class action cases). Plaintiffs' Co-Lead Counsel Wolf Haldenstein Adler Freeman & Herz LLP and Beckham & Mandel (whose Firm Resumes are attached hereto as Exhibits B and C to the Rifkin Decl.) are highly experienced in complex securities class actions and have successfully prosecuted numerous such suits throughout the country. In addition, Lead Plaintiff and her counsel conducted extensive investigation into Defendants' fraudulent scheme, prepared the Complaint, successfully defended against a motion to dismiss filed by Defendants, and they have propounded comprehensive discovery requests upon Defendants and non-party witnesses.

As Lead Plaintiff and her counsel are particularly well-suited to competently and fairly represent the Class members' interests, the adequacy requirement of Rule 23(a)(4) is satisfied.

## C.    This Action Satisfies Rule 23(b)(3)

In addition to satisfying the requirements of Rule 23(a), Lead Plaintiff must also satisfy one of the sub-sections of Rule 23(b). Rule 23(b)(3) is met when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." As discussed below, this case satisfies both the predominance and superiority criteria.

1.      **Common Questions Of Law And Fact Predominate**

"[P]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem Prods.*, 521 U.S. at 625. In this case, the common questions of law and fact set forth in Section I, *supra*, overwhelmingly predominate over any individual issues that may arise during the course of this litigation.

In analyzing predominance, it is well established that courts should focus on liability. So long as most of the liability issues are common to the class, predominance is satisfied even where some questions of law or fact would require individualized inquiry. *See Bertulli v. Indep. Ass'n of Cont. Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) (*citing Mullen*, 186 F.3d at 626-27). As set forth above, the predominant issues of liability here involve the allegedly unlawful public dissemination of materially false and misleading statements concerning the Fund's net asset value and inclusion of an excessive and unwarranted accrual for prepaid taxes that Defendants knew or recklessly disregarded the Fund was extremely unlikely ever to be able to utilize at least in part if not in its entirety – all of which are common to the Class. Compl. ¶¶ 37-38, 49. Each Class member purchased Fund shares at prices artificially inflated by Defendants' wrongful statements and omissions. Compl. ¶ 74. Consequently, critical issues of law and fact raised in this action involve questions of liability common to the Class, and predominate over individual issues. *See, e.g., Durrett v. John Deere Co.*, 150 F.R.D. 555, 560 (N.D. Tex. 1993).

Given that the predominance analysis focuses on the nature of the claims asserted, distinctions in the amount of damages recoverable by individual Class members are irrelevant to class certification. *See Hamilton*, 2010 WL 1223125, at *10 ("individualized claims for damages will not predominate over the common liability issues"). *See also Switzenbaum v. Orbital Scis. Corp.*, 187 F.R.D. 246, 248 (E.D. Va. 1999) ("All of the Plaintiffs appear to share a similar

interest in recovering from the Defendants, and the fact that the amount of their damages may differ does not pose a disabling risk of prejudice or confusion because separate claims for payment could be processed if liability were found"). Indeed, the only remaining potential individual issue in this matter pertains to Plaintiff and the Class's potential reliance upon Defendants material misstatements and omissions. On that point, courts are nearly unanimous that challenges on reliance grounds do not defeat class certification, as "requiring proof of individualized reliance . . . would effectively preclude securities fraud class actions under Rule 23(b)(3)." *See, e.g. In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 507 (1st Cir. 2005).

In fact, "a proposed class in a securities fraud class action such as this case may establish predominance by availing itself of the class-wide ***presumption*** of reliance permitted by the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1998)." *Barrie*, 2009 WL 3424614, at *8 (emphasis added). *Basic* held that "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market may be presumed." 485 U.S. at 247. Thus, even investors "who cannot satisfy the traditional requirement of proving actual reliance on a fraudulent representation," may nonetheless "maintain their fraud claims by interpreting the reliance requirement to mean reliance on the integrity of the market price rather than reliance on the challenged disclosure." *Barrie*, 2009 WL 3424614, at *8. (citation omitted).

For the presumption to apply, a "plaintiff must show that 1) the defendant made public material misrepresentations; 2) the defendant's shares were traded in an efficient market; and 3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed." *Id.* (*citing Greenberg*, 364 F.3d at 661). In addition, under a recent Fifth Circuit decision, Lead Plaintiff must now prove a fourth element: that the alleged

misrepresentations and corrective disclosures actually caused the Class's losses. *See id.*, 2009 WL 3424614, at *8 (*citing Oscar Private Equity Invs. v. Allegiance*, 487 F.3d 261 (5th Cir. 2007)). Importantly, however, Lead Plaintiff need not attribute a particular percentage of the stock drop to the corrective disclosure. *Allegiance*, 487 F.3d at 271.

In this case, there is no dispute that Defendants communicated to the public during the Class Period. Lead Plaintiff alleges that Defendants' public statements misrepresented and omitted facts about the Fund's NAV that were material to investors. Compl. ¶¶ 53-60. This satisfies the first requirement for the presumption. Nor is there any dispute that Plaintiff and the other Class members bought Fund shares during the Class Period *after* the alleged misrepresentations or omissions and *before* the corrective disclosure on December 19, 2008. *See* Compl. ¶¶ 1 and Section I above. Lead Plaintiff and the other Class members undoubtedly traded shares between the time of the allegedly false and misleading public statements and when the truth was revealed – satisfying the third requirement for the presumption.

As to the second requirement for the presumption to apply, to ascertain market efficiency, courts consider eight factors: (1) the stock's average weekly trading volume; (2) number of securities analysts following and reporting on the stock; (3) the presence of market makers; (4) the company's eligibility to file SEC registration Form S-3; (5) existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the Company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock. *See Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 (5th Cir. 2005). Each of these factors confirms an efficient market for the Fund. Consistent with those factors, there was an efficient market for Fund shares throughout the Class Period.

Lead Plaintiff submits the Preston Report that the market for Fund shares was efficient:

### (a)   The Fund's Shares Were Actively Traded Throughout the Class Period

As discussed in the Preston Report, approximately 9.5 million common shares of the Fund were issued and outstanding during the Class Period, with an average weekly volume of 256,095 shares.  Preston Report, ¶ 16.  Moreover, the turnover as a percentage of shares outstanding during the Class Period was 2.7 percent, exceeding the benchmark set by *Bell* of one-two percent.  (*Id.*)  This demonstrates the existence of an active market in the Fund's shares during the Class Period.

### (b)   Securities Analysts Followed and Reported on the Fund

During the class period, myriad analysts from major brokerage firms followed and wrote about the Fund.  Preston Report ¶ 17.[1]  The Fund was tracked and reported on through a steady and readily obtainable flow of information.  *Id.* ¶ 20.

### (c)   The Presence of Market Makers

Although trading on the NYSE is not facilitated by market makers, brokers had the option of trading Fund shares electronically over NYSE's electronic system or over the NASDAQ system.  Here, NASDAQ market makers show that a market existed in the Fund's shares.  *Id.* ¶¶ 21-23.  As the Preston Report confirms, between September 2008 and December

---

[1] Among the analysts reporting or providing information regarding the Fund's governance and services were Morgan Stanley, Wells Fargo Securities, Oppenheimer, Davenport & Company, Morningstar, Price Target Research, and Institutional Shareholder Services, among others.  *Id.*   These analyst reports were disseminated to the public and investment community through several electronic databases, including Bloomberg, Investext, First Call, Reuters, Dow Jones and the Lexis/Nexis database.  *Id.* ¶ 18.  In addition to the information provided by the aforementioned services, the Fund was required and did make filings with the SEC, reported to shareholders, issued reports, distributed press releases, and participated on conference calls with the investing public.  *Id.* ¶¶ 19-20

2008, 68 firms made a market in the Fund's shares, with the top ten firms accounting for approximately 2.9 million shares. *Id.* ¶ 23.[2]

### (d)   The Fund was Ineligible to file a Form S-3

Although the ability to file a "short-form" registration statement further indicates that information regarding a company is widely available, closed-end mutual funds – such as the Fund here – cannot file S-3 or S-4 registration statements. *Id.* ¶ 24.   Instead, the Investment Company Act of 1940 specifies that such funds must file Form N-2 to register their securities, which the Fund did in August 2007. *Id.*

### (e)   There Was a Cause and Effect Relationship Between Unexpected News and the Movement of the Stock Price

By controlling for general market and industry factors affecting the Fund's stock price, Ms. Preston developed a market model that quantified the mathematical and statistical relationship between changes in the price of the Fund's common stock and changes in the NYSE Composite Index. *Id.* ¶¶ 26-30.   Ms. Preston then utilized a common and reliable regression analysis, which included 78 observations encompassing the daily returns during the Class Period. (*Id.* ¶ 31.)   Based upon this analysis, Ms. Preston has determined that subsequent to the Fund's issuance of a press release on October 13, 2008 clarifying its leverage position and distinguishing itself from other MLP funds, the Fund's shares rose $3.65, correcting a recent price decline associated with the other closed-end funds investing in MLPs. *Id.* ¶¶ 33-34.   This price increase indicated a return of 43% in the Fund's stock price and was Fund-specific at a 99% confidence level. *Id.* ¶ 34.

---

[2] The Preston Report lists the market makers and their respective share volumes for the Class period. *Id.*

Similarly, when the Fund announced that its NAV had decreased $3.49 per share as a result of its review of its accounting treatment of the DTA on December 19, 2008, the Fund's shares dropped $3.59 over the following two trading days. *Id.* ¶¶ 35-36. The Fund declined by 30% percent in the first trading day, and an additional 26% in the second trading day. *Id.* ¶ 36. This immediate and extreme drop in the Fund's share price reflects a Fund-specific decline directly caused by the release of unexpected news.

### (f)   Market Capitalization Facilitated an Efficient Market

Throughout the Class Period, the Fund had approximately 9.5 million outstanding shares, and an equity market capitalization of approximately $156 million at the start of the Class Period and approximately $70 million at the close of the Class Period. *Id.* ¶ 37. The Fund's market capitalization during most of the Class Period placed it within the tenth decile of the universe of all companies trading on the NYSE, the American Stock Exchange, and NASDAQ at the same time. *Id.* ¶ 38. As such, the Fund's capitalization placed it as a "Low-Cap" stock, in the company of 910 of the 4,252 companies include in the Center for Research in Security Prices's NYSE/AMEX/NASDAQ universe as of November 2008. (*Id.*) As further discussed in the Expert Report, the Fund's market capitalization was sufficient to facilitate an efficient market.

### (g)   The Float Was Held by the Public As Opposed to Insiders

Of the Fund's approximately 9.5 million outstanding shares, only 92,461 were held by Fund insiders and affiliates as of September 30, 2008. (*Id.* ¶ 40.) In contrast to this three percent insider ownership, approximately 97% of the Fund's shares were held by institutional and individual investors. As such, the Fund's common stock was widely available, owned by outside investors, and traded by numerous market participants during the Class Period. (*Id.* ¶ 41.)

21

(h)     **The Bid-Ask Spread Was Consistent With an Actively Traded Closed End Mutual Fund**

The size of a stock's bid-ask spread – the difference between the highest price at which an investor would buy a security (the bid) and the lowest price at which a current holder would sell that security (the ask) – is a common measure of liquidity.  (*Id.* ¶ 42.)  A large the bid-ask spread is indicative of an inefficient, relatively illiquid market that makes a security relatively expensive to trade.  (*Id.*)  Plaintiff's Expert after a thorough review of available information, concluded that "he Fund's bid-ask spread was sufficiently narrow such that it would not be possible to systematically profit from differences in the spread," consistent with the bid-ask spreads for other NYSE stocks during the relevant time period  (*Id.* ¶¶ 43-44.)  As such, the market for the Fund's common stock was efficient during the Class Period.

To satisfy the fourth element – loss causation – the Fifth Circuit held in *Oscar* that the fraud-on-the-market presumption arises if the plaintiff proves that a material misstatement or omission actually moved the market in a detrimental fashion.  *See Barrie*, 2009 WL 3424614, at *13 (*citing Oscar*, 487 F.3d at 265).  A plaintiff can demonstrate the alleged misrepresentation's impact on the market by "1) demonstrating an increase in the stock price after the release of false positive news; or 2) demonstrating a decrease in price following a corrective disclosure."  *Id.* at *14.  Although "the initial false statement causing the stock price to increase and the later corrective disclosure causing the decrease [should be] factually related," *id.* (citations omitted), "a disclosure need not precisely mirror [an] earlier misrepresentation."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (citation omitted).

"Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and price subsequently drops."  *Id.* at 231 (*quoting In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)).  The loss need not be quantified, but must only

be shown to have occurred "because [the] new truth emerged in the marketplace." *Id.* ("leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss" is sufficient). Accordingly, "confirmatory information, information already known to the market, may not constitute a corrective disclosure." *In re Energy Transfer Partners Natural Gas Litig.*, 2009 WL 2633781, at *10 (S.D. Tex. Aug. 26, 2009) (*citing Greenberg*, 364 F.3d at 663).

As discussed in the Preston Report, that is precisely what happened here following the December 19, 2008, disclosure that the deferred tax asset was being reduced to zero to recognize that the Fund would not generate taxable income. Preston Report ¶ 50. The Fund's shares fell "immediately and precipitously" upon the disclosure. *Id.* Fund shares dropped from a closing price of $7.40 on December 19, 2008, to closing prices of $5.18 and $3.81 on the two subsequent trading days. *Id.* Each decline was statistically significant, confirming that the cause of the price movements was Fund-specific and were not observed "by chance." *See id.* ¶¶ 29 and 50. The severe price declines confirm the overwhelming materiality of the information.[3]

The misrepresentations and omissions injured each member of the Class in a substantially similar, if not identical, manner. Defendants prepared and disseminated the statements as part of a common course of conduct to distort the value of the Fund, fraudulently inducing Lead Plaintiff and Class members to rely upon the integrity of the market. As shown in the Preston

---

[3] That Defendants keenly understood the materiality of the data is corroborated by the issuance of the press release regarding the write-off of the deferred tax asset at the close of business on December 19, 2008. *Id.* ¶ 51. Indeed, Defendants thereafter quickly scheduled a conference call on December 23, 2008 to discuss the acute market response to the December 19, 2008 press release regarding the write-off of the DTA. The materialization of the previously undisclosed risks associated with the alleged misstatements and omissions was factually related to the later corrective disclosure, which precipitated the significant decline in stock value. *See Barrie*, 2009 WL 3424614, at *14; (Rep. ¶¶ 51-52). The "new truth [that] emerged in the marketplace" via the December 19, 2008 press release caused Plaintiff and the other members of the Class to suffer considerable losses. *Flowserve*, 572 F.3d at 231.

Report, the market prices for the Fund's shares – which traded in an efficient market – immediately plummeted by almost 50 percent within two trading days after the December 19, 2008, disclosure.  No other causal factors were implicated by this loss, satisfying the Fifth Circuit's requirements in *Oscar*.  Accordingly, the issues of law and fact flowing from the alleged wrongful conduct predominate over any individual issues in this class action.

### 2. A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action

This class action is clearly "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  As the Supreme Court stated:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521 U.S. at 617 (citation omitted).  Moreover, this Court has emphasized that "based on the number of potential plaintiffs, the relatively small amount of an individual shareholder's damage, and the potentially large liability of defendants, class action securities fraud litigation is often superior to alternative methods of adjudicating such disputes." *Krogman v. Sterritt*, 202 F.R.D 467, 479 (N.D. Tex. 2001); *see also Keasler v. Nat. Gas Pipeline Co. of Am.*, 84 F.R.D. 364, 368 (E.D. Tex. 1979) ("desirable that securities fraud cases involving a large number of plaintiffs with small individual claims proceed as class actions").[4]

---

[4] The class action mechanism provides for judicial efficiency by permitting common claims, issues, and facts to be adjudicated at once, with binding effect on all parties. *See, e.g., Longden v. Sunderman*, 123 F.R.D. 547, 558 (N.D. Tex. 1988) ("resolution of common issues in one proceeding" is "less burdensome than the problems which are likely to rise in handling the claims in nearly 100 separate [securities] actions").  The notion that class members with claims arising from the same course of conduct and based upon the same legal theories "should be required to file hundreds or thousands of individual lawsuits [is] (continued...)

To determine whether Rule 23(b)(3)'s "superiority" requirement is satisfied, the Court must consider: (a) the interest of members of the class in individually controlling separate actions; (b) the extent and nature of any related litigation already commenced by class members; (c) the desirability of concentrating the litigation of the claims in the particular forum; and (d) the potential difficulties likely to be encountered in managing a class action. Fed. R. Civ. P. 23(b)(3). Here, each of these factors strongly militates in favor of class certification.

There is no indication that members of the Class prefer to individually control the prosecution of their claims, and Class members retain the opportunity to opt out of the Class if they later determine such action to be in their best interest. In addition, "it would be economically prohibitive for many class members who suffered smaller losses to prosecute individual actions." *Barrie*, 2009 WL 3424614, at *20 (*citing Amchem*, 521 U.S. at 617). Furthermore, no related actions have been commenced, and "it is desirable to concentrate and continue the litigation in this forum," thereby "avoiding fragmentation of this case" and precluding any inconsistent adjudications. *Id.* Finally, no exceptional management difficulties are anticipated: "All class members bring federal securities fraud claims and present no individually novel legal issues," and liability will be determined by common evidence of fraudulent misstatements and omissions. *Id.* In sum, class certification will secure the rights of injured investors who are otherwise unable to seek redress for Defendants' allegedly wrongful behavior. Class certification will also advance the statutory and policy objectives of a fair,

---

(…continued)

illogical, and forcing them to do so would encourage a waste of judicial and private resources." *Barrie*, 2009 WL 3424614, at *20.

orderly, trustworthy, and reliable securities market.  As such, this class action is the superior, and indeed the only practical, method for expeditiously resolving this controversy.

**D.**   **The Court Should Appoint Co-Lead Counsel As Class Counsel**

Rule 23(g) provides that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." For the reasons formerly stated, Plaintiff respectfully requests that Wolf Haldenstein and Becham & Mandel be appointed co-lead counsel for the Class.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Action be certified as a class action on behalf of the Class.

Dated: April 26, 2010                                         Respectfully submitted,


                                                          s/ Roger L. Mandel
                                              ROGER L. MANDEL
                                              Texas Bar No. 12891750
                                              Jose M. Portela
                                              Texas Bar No.: 90001241
                                              BECKHAM & MANDEL
                                              3400 Carlisle, Suite 550
                                              Dallas, Texas 75204
                                              214-965-9300 (Telephone)
                                              214-965-9301 (Fax)


                                                   s/  Mark C. Rifkin
                                              Mark C. Rifkin (MR-0904)
                                              Kate McGuire
                                              Michael Yanovsky
                                              **WOLF HALDENSTEIN ADLER**
                                              **FREEMAN & HERZ LLP**
                                              270 Madison Avenue
                                              New York, NY  10016
                                              (212) 545-4600

                                              *Co-Lead Counsel for the Class*

                                              Norman Shabel
                                              **SHABEL & DENITTIS, P.C.**

5 Greentree Centre, Suite 302
Marlton, NJ  08053
(856) 797-9951

MARC R. STANLEY
Texas Bar No. 19046500
MARTIN WOODWARD
Texas Bar No. 00797693
**STANLEY, IOLA, L.L.P.**
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
214.443.4300 (Voice)
214.443.0358 (Fax)

*Attorneys for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 26, 2010, the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/ Roger L. Mandel
Roger L. Mandel

28