UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| TERRI MORSE BACHOW, Individually on Behalf of Herself and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SWANK ENERGY INCOME ADVISERS, LP, SWANK CAPTIAL, LLC, JERRY V. SWANK, MARK W. FORDYCE, CPA, BRIAN R. BURCE, RONALD P. TROUT, and EDWARD N. McMILLAN, <br><br> Defendants. | C.A. No. 09-cv-262-K |

**Report of Candace L. Preston in Support of Class Certification**

I. Assignment

1.      I have been retained in connection with this matter by Plaintiff's Co-lead

Counsel for the Class ("Counsel").  In particular, Counsel requested that I review and

discuss the efficiency of the market for the Cushing MLP Total Return Fund (the "Fund")

between September 1, 2008 and December 19, 2008, inclusive (the "Class Period").  I

have prepared and signed this written report in fulfillment of the obligations imposed by

Federal Rule of Civil Procedure 26(a)(2).  My opinions in this matter are based in part

upon information obtained by Counsel through their investigation to date, and are subject

to supplementation and/or revision in light of additional information that may come to

light through further discovery.


EXHIBIT D

II. Qualifications

2.      A copy of my curriculum vitae is attached as Exhibit A.  A summary of the matters in which I have rendered testimony either at trial or in a deposition within the last four years is attached as Exhibit B.

3.      To summarize my qualifications, I am a graduate of Eastern Michigan University and received an MBA from the Wharton School of Finance, University of Pennsylvania.  I am a founding member of Financial Markets Analysis, LLC ("FMA"). FMA is a valuation and securities analysis firm with offices located in Princeton, New Jersey and San Diego, California.  FMA provides valuation, financial analysis and related consulting to its clients.  FMA personnel have frequently been called upon to prepare reports and to testify as experts in class actions under federal and state securities laws. Such testimony has regularly included market efficiency, the materiality of information conveyed to investors, loss causation, the valuation of publicly traded securities based upon the absence of alleged misstatements and/or the disclosure of alleged omissions and misrepresentations, and damages caused by the alleged misstatements and omissions.

4.      Prior to joining FMA I was a managing director at BNY Capital Markets, Inc. ("BNY"), a wholly owned subsidiary of the Bank of New York.  At BNY, I was the managing director responsible for valuations done in conjunction with fairness opinions, mergers and acquisitions, private financings and other investment banking projects.

5.      Prior to joining BNY I was a founding partner of Triumph Partners, LLC ("Triumph"), a valuation and consulting firm.  Before founding Triumph, I was an executive vice president of Princeton Venture Research, Inc.

6.      I have not authored any publications within the past ten years.

7.     FMA is being compensated in this matter based on the number of hours expended at the rates charged for personnel, which range from $75 to $450 per hour, plus out-of-pocket expenses. My hourly rate is $450.  Our compensation is in no way contingent upon the outcome of this matter.

III.  Summary of Opinions

8.     It is my opinion that:  i) the market in which the Fund traded was open, well-developed, active and impersonal;[1] ii) the Fund's stock was widely owned and traded by numerous market participants; iii) information about the Fund was readily available and disseminated to market participants; and iv) the price of the Fund stock rapidly reflected new, relevant publicly available information concerning the Company.  Therefore, it is my opinion that the market for the Fund during the Class Period can be characterized as efficient.  I will demonstrate that the market for the Fund during the Class Period met the specific factors relied upon by financial economists as well as certain courts of law to determine whether a particular security traded in an efficient market.

IV.  Support for Opinions

9.     My opinions are based upon my professional knowledge and experience, a comprehensive review of data, documents and information relevant to this matter, and an analysis of the available trading information and relevant market information for the Fund stock. In forming my opinions I considered the following:

   a)  First Amended Consolidated Complaint filed in this matter;

   b)  Daily stock price and volume data for the Fund stock as well as other share information;

---

[1] Throughout the Class Period, Cushing MLP's common stock traded on the New York Stock Exchange (NYSE) under the ticker SRV.

  c) Bid and ask quotation data for the Fund stock;

  d) Information regarding holders of Cushing MLP stock, including holdings by Company insiders and reporting institutional investors during the relevant period;

  e) The Fund's filings with the Securities Exchange Commission ("SEC") including Forms N-2, annual and Semi-annual Reports, and Proxy Statements;

  f) Analyst reports written about the Company during the relevant time period; and

  g) News articles and press releases disseminated about the Company during the relevant time period.

## V.   Market Efficiency

10. The concept of an "efficient" market evolved from the Ph.D. dissertation of Eugene Fama. Dr. Fama made the argument that in an active market that includes many well-informed and intelligent investors, securities prices will reflect all available information. If the market is efficient, no investment based on information or analysis can be expected to consistently outperform an appropriate benchmark.[2] The concept of market efficiency has been studied extensively following Dr. Fama's initial work. The Efficient Market Hypothesis (the "EMH") postulates there are three forms of market efficiency -- weak, semi-strong and strong. The three forms of efficient markets are distinguished by the degree of information reflected in securities prices.

11. The weak form of the EMH postulates that stock prices reflect information about their past prices, and is widely accepted by market participants. If markets are weak-form efficient, it is impossible to earn consistent profits by studying past returns alone. The market is said to "have no memory" regarding past stock prices. At the other

---

[2] Fama, Eugene F., "Random Walks in Stock Market Prices," *Financial Analysts Journal,* September/October 1965.

end of the spectrum is the perfectly efficient market, or strong-form efficient. In a strong-form efficient market, stock prices reflect all information about a stock, including non-public information. Market participants generally agree that strong-form efficiency is an ideal, with very little real-world existence.

12.    The semi-strong form of efficiency postulates that stock prices reflect all public information. In markets that are semi-strong efficient, stock prices adjust rapidly to public information. The speed with which a stock price adjusts to new information depends upon the nature of the new information and how quickly one is able to digest the implications of the information. In my opinion, the relatively rapid inclusion of new, relevant information in the price of a security is the most reliable indication of market efficiency.

13.    Financial analysts typically examine a number of factors to determine market efficiency including the number and depth of market participants, the availability of information about the security, and, most importantly, the responsiveness of the security price to the disclosure of new information.

14.    Case law precedent also exists on the indicators of market efficiency. The court in Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 313 (5th Cir. 2005), listed eight factors to be considered in determining whether the market for a given stock is efficient. The Bell factors are as follows:

        a.  whether the stock was actively traded, as evidenced by a large weekly volume of stock trades, such as an average weekly turnover of one or two percent of the outstanding shares;

        b.  whether a significant number of securities analysts followed and reported on the stock during the class period;

        c.  whether the stock had numerous market makers;

    d.  whether the Company was eligible to file a Form S-3 ("short- form") Registration Statement in connection with public offerings of securities; and

    e.  the existence of empirical facts that show a cause and effect relationship between unexpected corporate events and financial releases and an immediate response in the stock price.

    f.  the company's market capitalization;

    g.  the float, the percentage of shares held by the public as opposed to insiders; and

    h.  the bid-ask spread for stock sales.

15.    The following sections address the eight factors outlined in <u>Bell</u>, and show that the Fund satisfies each relevant criterion and that its stock should be presumed to have traded in an efficient market.

    A.  <u>The Fund's Shares Were Actively Traded Throughout the Class Period</u>

16.    During the Class Period, there were approximately 9.5 million common shares issued and outstanding. I examined the average weekly trading volume relative to the number of shares outstanding.[3] Overall, the average weekly volume was 256,095 shares. The turnover as a percentage of shares outstanding during the Class Period was 2.7 percent, exceeding the benchmark provided by Bell of one to two percent, and demonstrating that an active market in the shares was present during the Class Period.

    B.  <u>Securities Analysts Followed the Fund</u>

17.    Information concerning the Fund was available to the market through reports by analysts who followed the Fund and its competitors. During the Class Period, analysts from major brokerage firms, including but not limited to: Morgan Stanley, Wells Fargo

---

[3] I obtained weekly trading volume for the Fund from Bloomberg for the weeks ended September 5, 2008 through December 19, 2008.

Securities, Oppenheimer, Davenport & Company and followed and wrote about the Fund. In addition, information about the Fund was available from Morningstar, a company specializing in mutual funds and from PriceTarget Research. Moreover, Institutional Shareholder Services ("ISS") published reports on the Fund including governance and proxy advisory services.[4]

18.     These analyst reports were available to the public and the investment community through brokers as well as various electronic databases including Bloomberg, Investext, First Call, Reuters, Dow Jones and the Lexis/Nexis database.

19.     In addition to these sources of information, the Fund was required to make filings with the SEC. Filings made by the Company provided important information to the market, including business conditions affecting the Company's financial performance, and other matters affecting its stock price. I have attached as Exhibit C a listing of the Fund's SEC filings made during 2008.

20.     Through the SEC filings and other reports to shareholders, the financial analysts who followed the stock and issued reports during the relevant period, and through the Company's own distribution of press releases, conference calls and information concerning its business, there was a steady and readily obtainable flow of information concerning the Company that was made available to the investment community and to the market.

        C. Market Makers

21.     The Fund's shares have been listed for trading on the NYSE since August 2007. The NYSE is the world's largest and most active stock exchange.

---

[4] ISS is a wholly-owned subsidiary of RiskMetrics that supplies investment advice to large institutional investors.

22.     Trading on the NYSE is not facilitated by market makers, but by "specialists" employed by the exchange to maintain an orderly market and to prevent share imbalances.  In order to be listed on the NYSE, companies must meet certain requirements including those related to market liquidity, market value, and number of holders.  In addition, listed companies are required to comply with SEC rules and regulations and regularly file financial and other information with the SEC and to disseminate financial and other information to investors.  Securities which are listed and traded on the NYSE are generally presumed to be efficient given a number of factors including the depth and liquidity of this market and the listing and reporting requirements imposed on these exchange-listed companies.

23.     Although the Fund was listed on the NYSE, brokers have the option of trading the shares electronically, often over the NYSE's own electronic system or over the NASDAQ system.  As a result, there are NASDAQ market makers that make a market in the Fund's shares.  From September 2008 through December 2008 there were 68 firms that made a market in the Fund's shares.  Of those 68, the top ten accounted for approximately 2.9 million shares.  I have attached as Exhibit D a list of market makers and their share volume for the period September 2007 through December 2007 which I obtained from Bloomberg.

D. <u>Ability to File Form S-3 When Registering Securities</u>

24.     Another indication that information about a company is widely available to the public is the company's eligibility to file a "short-form" registration statement, including on Form S-3, ahead of its offering of securities for sale to the public.  This is not an applicable test for the Fund.  Closed-end mutual funds do not file S-3 or S-4

registration statements.  The Investment Company Act of 1940 specifies that closed-end

mutual funds use a Form N-2 to register their securities.  The Fund registered its

securities using a Form N-2 in August 2007.

E.   Empirical Facts Demonstrate a Cause and Effect Relationship between
Unexpected News and the Movement of the Stock Price

25.     Courts have generally found that the most telling indication of market

efficiency is whether the price of the security quickly responds to new, relevant

information.  In 1969, Fama, Fisher, Jensen and Roll pioneered the use of "event studies"

in their paper regarding the adjustment of stock prices to announcements of stock splits.[5]

Event studies generally involve the comparison of the day-to-day percentage change in

the price of a company's stock (known as the "return") that results from the disclosure of

new information.  The comparison is often done using a statistical tool known as

"regression analysis."  The subject stock price return is typically compared to a "normal"

or "expected" return.  The regression analysis generally calculates the relationship

between the historical stock price returns of the company and the returns of a market

and/or industry index, this is known as a "market model."[6]  The expected return is

calculated by applying an equation generated by regression analysis.[7]   Regarding event

studies and the use of daily stock price data Fama concluded, "When the announcement

of an event can be dated to the day, daily data allow precise measurement of the speed of

---

[5] Fama, Eugene F., Fisher, Lawrence, Jensen, Michael C., and Roll, Richard, "The Adjustment of
Stock Prices to New Information," *International Economic Review*, Vol. 10, No. 1, February 1969.

[6] See, e.g., J. Campbell, A. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets*,
*Princeton University Press* (1997), p. 156.

[7] The regression analysis produces slope coefficients, called "betas" that quantify the relationship of a
security's return to the returns of the market and industry indexes.  A security with a market beta of 0.5 is
expected to increase (or decrease) by half of a percent for every one percent increase (decrease) in the
market.

the stock-price response – the central issue for market efficiency."[8]  Event studies are useful in examining the cause and effect relationship between unexpected corporate events and changes in the stock price.

26.     One generally begins an event study by identifying the events in question and by defining the event window.  As Fama suggested, when the subject company's stock is traded in an efficient market, an event window of one-day, measured as the price change from the close of trading on day t-1 to day t, is both practical and generally accepted. The types of events that one might expect to cause a change in the value of the company and, as a result, the market price of its stock, include, but are not limited to:  unexpected (positive or negative) earnings announcements, changes in dividend policy, merger or acquisition announcements, and changes in analysts' opinions regarding the security.

27.     I conducted a search of electronic archives of news articles pertaining to the Fund during the Class Period through Bloomberg, Dow Jones Factiva and the Internet.  I selected several news items, or events, which I posited might have caused a significant change in the price of the Fund's stock.  Security prices, in general, would not be expected to exhibit significant returns when information entering the market is consistent with previously disclosed information, or is anticipated by market participants.  I focused my attention on unexpected announcements or revelations of new information that might impact the price of the Fund's common stock.

28.     An event study involves using the regression equation to predict a normal return for the security during the event window and a comparison of the predicted return to the actual return for the security.  The difference between the predicted return and the

---

[8] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, Vol. XLVI, No. 5, December 1991.

actual return is known as the excess return or "residual" return. A market model such as the one that I employed in this matter is a generally accepted, widely used method to generate the predicted returns and to obtain estimates of residual returns.[9]

29.     The approach of this methodology is to use the statistical method of linear regression to extract market-wide and industry effects from the effects of company-specific events. I employed standard statistical measures to test for significant company-specific price changes over a one-day event window. Finally, statistical testing is performed in order to determine whether the residual return is statistically "significant." If the subject return is outside of the stock's normal volatility range, it is said to be "significant." The degree of confidence in the significance is measured by how far the subject return is outside of a stock's normal volatility range, for example, one or two standard deviations from the mean. The indicator of this confidence level is known as the "t-statistic."[10] In considering whether certain residual returns for the Fund were statistically significant, I utilized a t-statistic with an absolute value (i.e., either positive or negative) of 2.0, which indicates with 95 percent confidence that the price movements were not observed "by chance."

30.     In order to control for general market and industry factors affecting the Fund's stock price, I developed a market model which quantified the mathematical and statistical relationships between changes in the price of the Fund's common stock and changes in

---

[9] See, e.g., MacKinlay, A.C., "Event Studies in Economics and Finance," Journal of Economic Literature, Vol. XXXV (March 1997) pp.13-39.

[10] Reliable regression equations depend on the sample data having a "normal" distribution; i.e., when graphed, the data form a bell-shaped curve. The curve has two "tails" which are the far left and far right of the bell-shaped curve. A two-tailed test allows for data falling either to the right or left of the middle of the curve. In a two-tailed test, 95 percent of the area under the bell curve occurs within approximately two standard deviations of the mean value, with 2.5 percent remaining on the far left and 2.5 percent remaining on the far right.

the New York Stock Exchange Composite Index ("NYSE Index") and changes in the

Standard and Poor's 500 Oil & Gas Storage & Transportation Index ("Oil Index").  The

Oil Index is a capitalization weighted index. The index was developed with a base level

of 10 for the 1941-43 base period.  The parent index is SPX.

31.     I chose the Oil Index as an independent variable because of the large

concentration of energy stocks in the Fund.  I also checked other energy indexes and

found that the statistical fit between the returns of the Fund and the returns of the Oil

Index was better than the statistical fit of the Fund returns and other energy indexes.

32.     The regression analysis included 78 observations, encompassing the daily

returns for the period from September 2, 2008 (the first trading day in the Class Period)

and December 19, 2008 (the last day of the Class Period).  The analysis produced the

regression equation shown below:

| *Regression Statistics* | | | *Coefficients* | *Standard Error* | *t Stat* |
|---|---|---|---|---|---|
| Multiple R | 0.5940 | Intercept | -0.0029 | 0.0076 | -0.3841 |
| R Square | 0.3528 | X Variable 1 | -0.2751 | 0.4635 | -0.5936 |
| Adjusted R Square | 0.3355 | X Variable 2 | 0.8974 | 0.3066 | 2.9272 |
| Standard Error | 0.0670 | | | | |
| Observations | 78 | | | | |

33.     Using the regression equation described above, I calculated daily predicted

and residual returns for the Fund's common stock on the selected event days.  If the

residual return was statistically significant at the 95 percent level, having a t-statistic with

an absolute value of 2.00 or greater, then I concluded that the Fund's stock price

responded in a meaningful way to the company-specific information or event,

independent of changes in the market and industry index.  The table below shows the

selected events in this study, the actual, predicted, and residual returns on those event

days, and the t-statistic for the residual returns.

| | Cushing MLP Price | NYSE Index | S&OGST | Actual Return | Predicted Return | Residual Return | T-statistic |
|---|---|---|---|---|---|---|---|
| 10/10/2008 | $8.34 | 5704.13 | 80.22 | | | | |
| 10/13/2008 | $11.99 | 6400.96 | 98.24 | 44% | 17% | 27% | 4.07 |
| | | | | | | | |
| 12/19/2008 | $7.40 | 5616.12 | 76.95 | | | | |
| 12/22/2008 | $5.18 | 5520.82 | 74.94 | -30% | -2% | -28% | -4.15 |
| 12/23/2008 | $3.81 | 5468.28 | 74.45 | -26% | -1% | -26% | -3.85 |

### Discussion of Selected Events

34.     On October 13, during the trading day, the Fund issued a press release

clarifying its leverage position and distinguishing itself from other MLP funds with

regard to borrowing terms with its lender.  The press release stated:

> The Cushing Total Return Fund is providing an update in light of recent
> price declines experienced across the MLP sector and investor inquiries
> regarding Fund's compliance status with its leverage limitations.
> Recently, other closed-end funds which invest in MLP sector may have
> been forced to liquidate positions as a result of falling out of compliance
> with the leverage terms of their outstanding classes of preferred stock or
> corporate debt.  The Fund is not exposed to such a risk.  Fund is in
> compliance with leverage requirements.  Fund is in compliance with the
> terms of its borrowing arrangement with Credit Suisse.

35.     In response to this announcement, the Fund's shares rose $3.65, largely

correcting the recent price decline associated with the other closed-end funds investing in

MLPs, as explained in the press release of October 13, 2008.  The price increase was a

return of 43% in the Fund's stock price and had a t-statistic of 4.07, indicating the rise

was Fund-specific at greater than the 99 percent confidence level.

36.     On Friday, December 19, 2008, after the close of the market, the Fund

announced that its NAV had decreased $3.49 per share as a result of a review of its

accounting treatment of a deferred tax asset and the consequential write-off of that asset.

37.     In response to this announcement, the Fund's shares dropped $3.59 over the

following two trading days as the market assessed the likely impact on the overall value

of the Fund.  The Fund declined $2.22, from a closing price of $7.40 on Friday,

December 19, 2008 to a closing price of $5.18, a return of negative 30 percent with a t-statistic of negative 4.17, indicating the decline was Fund-specific at greater than the 99 percent level.   The following day, the Fund declined another $1.37, from a closing price on Monday, December 22, 2008 of $5.18 to a closing price of $3.8 on Tuesday, December 23, 2008.  The price decrease was a negative 26 percent with a t-statistic of negative 3.85, indicating the decline was Fund-specific at greater than the 99 percent level.

### F. The Fund's Market Capitalization Was Between $70 Million and $156 Million During the Class Period

38.    Throughout the Class Period, the number of Fund shares outstanding was fairly consistent at approximately 9.5 million.  The Fund's equity market capitalization (shares outstanding multiplied by market price) was approximately $156 million at the beginning of the Class Period, which was its high, and stood at approximately $70 million at the end of the Class Period.

39.    To place these figures in context, during most of the Class Period, the Fund's market capitalization would have placed it within the tenth decile of the universe of all companies trading on the NYSE, the American Stock Exchange ("AMEX") and NASDAQ at about this time.  Within this construct, created by the Center for Research in Security Prices ("CRSP") at the University of Chicago, the Fund's market capitalization placed it as a "Micro-Cap," along with 2228 of the other 3,806 companies included in CRSP's NYSE/AMEX/NASDAQ universe as of September 30, 2008.[11]  Companies considered "Large-Cap" made up eight percent of the universe, "Mid-Cap" companies made up 15 percent of the universe, Low-Cap companies made up 26 percent of the

---

[11] Source: Ibbotson Associates, Stocks, Bonds, Bills, and Inflation Valuation Edition 2009 Yearbook, P. 114.

universe, and the smallest companies, designated "Micro-Cap," made up 59 percent of the universe.

40.     While the Courts have cited market capitalization as a factor to be considered in determining market efficiency, an objective threshold has not been quantified. It is my opinion that the Fund's market capitalization was sufficient, especially in conjunction with the other characteristics discussed herein, to facilitate an efficient market.

G.   The Float, the Percentage of Shares Held by the Public as Opposed to Insiders

41.     During the Class Period the Fund had 9.5 million shares outstanding. Of those, 92,461 (less than three percent) were held by Fund insiders and affiliates as of September 30, 2008. The remaining 97 percent of the shares were held by institutional investors, including funds, banks, investment management firms, and individual investors.

42.     I examined the historical quarterly holdings of the Fund's common stock by reporting institutional investors. There were approximately 20 institutions that held shares of the Fund's common stock during the Class Period. As previously mentioned, many institutions held shares on behalf of individual investors. It is my opinion, based on these data, that the Fund's common stock was widely available, owned by multiple investors, and traded by numerous market participants during the Class Period.

H.   The Bid-Ask Spread for the Fund's Stock Was Consistent With An Actively Traded Closed End Mutual Fund

43.     The size of a stock's bid-ask spread, which is the difference between the highest price at which an investor is willing to buy a security (the bid) and the lowest price at which a current holder is willing to sell that security (the ask), is an oft-quoted

measure of liquidity.[12]  Since the bid-ask spread is one of the transaction costs borne by both buyers and sellers, an inverse relationship exists between the size of the bid-ask spread and liquidity.  A large bid-ask spread might be indicative of an inefficient, relatively illiquid market because it is a cost which makes a security relatively expensive to trade.

44.    To put the Fund's bid-ask spread into perspective, I examined the Fund's bid-ask spread relative to those of other closed-end mutual funds with investment concentrations in the energy sector (the "Comparables").  In order to identify the Comparables, I analyzed various reports and news sources that mentioned the fund and other funds that they deemed comparable.  I chose a group identified by Wachovia Capital Markets, LLC.  I obtained historical bid and ask quotes for the Fund and the Comparables from the NYSE Trade and Quote Database ("TAQ") for the month of November 2008.[13]  I analyzed the bid-ask spreads for the Fund and the Comparables on the NYSE during trading hours for each of the nineteen trading days for that month.  On average, the bid-ask spread for the Fund was 2.25 percent.  These results are consistent with the average quoted spreads of between 0.86 percent and 2.74 percent per share for the Comparables.[14]

---

[12]  See, e.g., Damodaran on Valuation: Security Analysis for Investment and Corporate Finance, 2nd Edition, Aswath Damodaran, Chapter 14, The Value of Liquidity, pps. 497-512.

[13]  I purchased bid-ask data for the month of December 2006, which is the approximate chronological middle of the Class Period in this matter.  As retrieval and analysis of TAQ data is fairly expensive ($1000 per month) and time-consuming, I have limited my analysis to this month.  I did not detect anything unusual about the reported trading volume and price changes during the period of my review and I have assumed, for this purpose, that the bid-ask spread in December 2006 is indicative of the bid-ask spread during the Class Period.

[14]  High-Frequency Trading Helps Narrow Quoted Spreads (2009), retrieved September 17, 2009 from http://exchanges.nyse.com/archives/2009/08/hft.php.

45.     In my experience, the Fund's bid-ask spread was sufficiently narrow such that it would not be possible to systematically profit from differences in the spread, especially when one considers trading costs. Further, the bid-ask spread for the Fund's common stock was consistent with those of the Comparables during the relevant time period, and supports the conclusion that the market for its common stock was efficient during the Class Period.

## VI.   Conclusion Regarding Efficiency

46.     Based on the above analysis of the Bell factors, including my event studies and analysis of the cause and effect relationship between unexpected company-specific events and significant changes in the Fund's stock price, it is my opinion that the market for the Fund's common stock was efficient.

## VII.   Materiality and Loss Causation of the Alleged Misstatements and Omissions

47.     Any statement made by a fund's management is evaluated thoroughly and give weight by the market. Information that comes from a fund's management is assumed to have the highest reliability. The investment public assumes that management recognizes its legal responsibilities when making public disclosures in presentations, press releases, conference calls, SEC filings and other communications. Investors and analysts expect that they will not be misled directly by, or by the obvious inferences to be derived from management's statements.

48.     In general, a fact is "material" if there is a substantial likelihood that it would alter a reasonable investor's perception of the total mix of information such that an investor would consider the fact to be important in deciding whether to invest in the company. Since investment decisions always consider the price of the investment, one

of the most straightforward measures of materiality of information is whether or not such information would affect the price of an investment.

49.     Plaintiffs allege that, at least by the beginning of the Class Period, defendants knew or recklessly disregarded information that there was extremely strong evidence that, among other things, it was far more likely than not that the Fund would *not* generate taxable income and, therefore, (i) tax benefits would *not* be realized, and (ii) a valuation allowance *was* required to reduce the deferred tax asset to zero.[15]

50.     When, after the market closed on December 19, 2008, defendants announced that the valuation of the deferred tax asset was being reduced to zero to recognize that the Fund would not generate taxable income, and therefore the tax benefits would not be realized, the price of the Fund's shares fell immediately and precipitously. As shown above, the stock declined from a closing price of $7.40 on December 19, 2008 to closing prices of $5.18 and $3.81 on December 22 and December 23, 2008, respectively. Each of these declines was statistically significant at greater than the 95% level. The level of significance indicates that the cause of the price decline was Fund-specific. In addition, the price declines indicate the overwhelming materiality of the information.

51.     Moreover, the issuance of the press release regarding the write-off of the deferred tax asset is a further indication that management of the Fund understood the materiality of the information. The scheduling of a conference call on December 23, 2008 to discuss the December 19, 2008 press release regarding the write-off of the deferred tax asset and the market response to it is further evidence that management of the Fund knew that the information was material and that the materialization of the

---

[15] Complaint, p.14.

previously undisclosed risks associated with the allegedly misstatements and omissions regarding tax deferred assets were the direct cause of investor losses in the Fund shares.

52.     It is my opinion that the alleged misstatements and omissions regarding the value of the deferred tax asset and the corrective disclosure which took place on December 19, 2008 caused investors to suffer losses.

VIII.   Summary and Conclusion

53.     Based on the above analysis, it is my opinion that the market for Cushing MLP common stock was efficient in that the price of the Fund shares responded quickly to new information.  Further, it is my opinion that the Fund exhibited the indicia of efficiency as put forth in Bell.  Additionally, in my opinion, the disclosure and correction of the previous misstatements and omissions regarding the value of the deferred tax asset caused the price of the Fund's common shares to decline and caused investors to suffer losses.

Candace L. Preston, CFA
April 26, 2010

19

Exhibit A

# CANDACE L. PRESTON

| | |
|---|---|
| Present | Financial Markets Analysis, LLC. Founding member of the firm. Financial consultant specializing in securities and business valuations in mergers, acquisitions, appraisals, business planning, brokerage/customer arbitrations, and litigation. Significant testimonial experience in breach of contract, bankruptcy, anti-trust, securities and consumer class actions. Clients include private and public companies, individual and institutional investors, the S.E.C. and law firms. |
| 1998 – 2001 | The Bank of New York, BNY Capital Markets. Managing Director responsible for valuations and special financial services. Valuations relating to fairness opinions, mergers, acquisitions, executive compensation, estate and intergenerational transfers, and litigation. |
| 1998 | Triumph Partners, LLC. Founding member of the firm. Financial consultant specializing in securities and business valuations in mergers, acquisitions, appraisals, business planning, brokerage/customer arbitrations, and litigation. Valuation expert for the S.E.C. in its prosecution of Crazy Eddie, Inc. and Eddie Antar, and in efforts to recover monies from the Antar family. |
| 1985 - 1998 | Princeton Venture Research, Inc. Executive Vice President. Princeton Venture Research is an investment banking and consulting firm. Managed Princeton and San Diego offices. Supervised all analytic and research staff. Responsible for valuations in mergers and acquisitions, due diligence investigations, and litigation projects. Clients included Securities Investors Protection Corporation (SIPC), major financial institutions and law firms. Valuation expert for damages claims against Drexel Burnham Lambert, SubClass B. |
| 1980 - 1985 | NewMarkets. Senior consultant for management consulting firm, specializing in marketing and business planning for new ventures and turn-around situations. Developed plans for Fortune 500 companies as well as smaller businesses, which resulted in the creation and funding of new divisions and enterprises. |
| 1974 - 1978 | Family-owned businesses. Participated in the operation and management of a diverse group of businesses, including acquisitions and divestitures of numerous stand-alone operations. Among the businesses were an automotive plastics manufacturer, restaurants, automobile dealerships and real estate holdings. |
| 1970 - 1973 | U.S. Army, Tank and Automotive Command (TACOM). Civilian employee of branch responsible for negotiation and administration of contracts for wheeled and track vehicles. Negotiated and audited contracts for tank prototypes as well as tanks in production. |

## EDUCATION

| | |
|---|---|
| 1985 | M.B.A. University of Pennsylvania, Wharton School of Finance |
| 1970 | B.A. History, Eastern Michigan University |

## PROFESSIONAL DESIGNATIONS AND AFFILIATIONS

Chartered Financial Analyst (CFA)
Member, CFA Institute
Member, New York Society of Security Analysts (NYSSA)

| | | |
|---|---|---|
| OTHER | University of Chicago<br>Guest lecturer in finance | American Bar Association Annual Meetings<br>Securities Litigation Panels |
| | University of Pennsylvania<br>Guest lecturer in finance | National Association of Public Pension Attorneys<br>Securities Litigation Panel |
| | Rutgers University<br>Guest lecturer in securities law | |

Exhibit B

<u>Testimony of Candace L. Preston</u>

<u>In Re: Biovail Corporation Securities Litigation</u>
03-CV-8917 (RO)
U.S. District Court, Southern District of New York
Deposition: June 9, 2006

<u>Alexander C. Hitz and Thomas L. Shaw v. SunTrust Bank f/k/a Trust Company of Georgia</u>
Civil Action No. 2005-CV-98992
Superior Court of Fulton County, State of Georgia
Deposition: June 12, 2006

<u>In Re: Philip Services Corp. Securities Litigation</u>
98-CV-835
U.S. District Court, Southern District of New York
Deposition: October 18, 2006

<u>In Re: Winstar Communications Securities Litigation</u>
01 Civ. 3014 (GBD)
U.S. District Court, Southern District of New York
Expert Report, Deposition: May 3, 2007

<u>In Re: Bayer AG Securities Litigation</u>
03 – CV – 1546 (WHP)
U.S. District Court, Southern District of New York
Expert Report, Deposition: September 14, 2007

<u>In Re: Credit Suisse First Boston Corp. (Lantronix) Analyst Securities Litigation</u>
03 – CV – 2367 (JES)
U.S. District Court, Southern District of New York
Expert Reports, Hearing Testimony: October 30, 2007

<u>Young, et al. v. Option Care, et al.</u>
02:07-CV-02435 (PD)
U. S. District Court, Eastern District of Pennsylvania
Expert Report, Revised Expert Report, Deposition: September 3, 2008, Arbitration: September 23, 2008

<u>Levie v. Sears Roebuck & Co., et al</u>
04-C-7643
U. S. District Court, Northern District of Illinois Eastern Division
Expert Report, Supplemental Report, Rebuttal Report, Deposition: October 30, 2008

<u>Testimony of Candace L. Preston</u>

<u>In Re: Aon ERISA Litigation</u>
Master Docket No. 04 C 6875
U.S. District Court, Northern District of Illinois Eastern Division
Expert Report, Deposition: May 8, 2009

<u>In Re:  Collins & Aikman Securities Litigation</u>
Case No. 2:06-cv-13555-GER-SDP
U.S. District Court, Eastern District of Michigan
Expert Report, Deposition: September 30, 2009

<u>In Re: Charles Schwab Securities Litigation</u>
Case No. C-08 01510 WHA
U.S. District Court, Northern District of California
Expert Report, Deposition: January 13, 2010

Exhibit C

**Extracted from Morningstar Document Research**
**Created : 04/20/2010**
**Search : CIK(1400897)**

| Company Name | Form Type | Date | Period |
|---|---|---|---|
| CUSHING MLP TOTAL RETURN FUND | 4 | 01/23/2008 | 01/08/2008 |
| CUSHING MLP TOTAL RETURN FUND | 3 | 01/23/2008 | 01/01/2008 |
| CUSHING MLP TOTAL RETURN FUND | NSAR-B | 01/29/2008 | 11/30/2007 |
| CUSHING MLP TOTAL RETURN FUND | N-CSR | 02/07/2008 | 11/30/2007 |
| CUSHING MLP TOTAL RETURN FUND | N-2 | 03/27/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | N-Q | 04/10/2008 | 02/29/2008 |
| CUSHING MLP TOTAL RETURN FUND | DEF 14A | 04/14/2008 | 05/14/2008 |
| CUSHING MLP TOTAL RETURN FUND | N-2/A | 05/02/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | N-2/A | 05/08/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | EFFECT | 05/08/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | 497 | 05/13/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | N-Q/A | 06/19/2008 | 02/29/2008 |
| CUSHING MLP TOTAL RETURN FUND | 4 | 06/25/2008 | 06/23/2008 |
| CUSHING MLP TOTAL RETURN FUND | 4 | 06/27/2008 | 06/25/2008 |
| CUSHING MLP TOTAL RETURN FUND | 4 | 07/02/2008 | 06/30/2008 |
| CUSHING MLP TOTAL RETURN FUND | 4 | 07/03/2008 | 07/02/2008 |
| CUSHING MLP TOTAL RETURN FUND | 40-17G | 07/11/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | N-PX | 07/24/2008 | 06/30/2008 |
| CUSHING MLP TOTAL RETURN FUND | NSAR-A | 07/30/2008 | 05/31/2008 |
| CUSHING MLP TOTAL RETURN FUND | N-CSRS | 08/06/2008 | 05/31/2008 |
| CUSHING MLP TOTAL RETURN FUND | 40-17G/A | 08/13/2008 | - |
| CUSHING MLP TOTAL RETURN FUND | N-Q | 10/22/2008 | 08/31/2008 |
| CUSHING MLP TOTAL RETURN FUND | N-2 | 10/30/2008 | - |

Exhibit D

Cushing MLP Total Return Fund
NASDAQ Market Maker Reports
Source: Bloomberg

| ID | Name | Sept. - Dec. 2008 Volume | % |
|---|---|---|---|
| NITE | KNIGHT EQUITY MARKETS, L.P. | 712,221 | 19.58 |
| SBSH | CITIGROUP GLOBAL MARKETS INC. | 467,825 | 12.86 |
| MSCO | MORGAN STANLEY & CO., INCORPOR | 393,727 | 10.82 |
| UBSS | UBS SECURITIES LLC. | 387,601 | 10.66 |
| CDRG | CITADEL DERIVATIVES GROUP LLC | 247,777 | 6.81 |
| PERT | PERSHING TRADING COMPANY L.P. | 175,500 | 4.82 |
| IBKR | INTERACTIVE BROKERS LLC | 152,735 | 4.2 |
| LIME | LIME BROKERAGE LLC | 124,190 | 3.41 |
| GSCO | GOLDMAN SACHS | 108,662 | 2.99 |
| PFSS | PENSON FINANCIAL SERVICES, INC | 107,239 | 2.95 |
| ECUT | BNY BROKERAGE INC. | 82,253 | 2.26 |
| CHAS | CHARLES SCHWAB AND CO. INC. | 70,883 | 1.95 |
| NFSC | NATIONAL FINANCIAL SERVICES LL | 66,839 | 1.84 |
| PWJC | UBS FINANCIAL SERVICES INC. | 57,729 | 1.59 |
| DEAN | MORGAN STANLEY DW INC. | 56,560 | 1.55 |
| MOKE | MORGAN KEEGAN | 50,539 | 1.39 |
| PFSI | PENSON FINANCIAL SERVICES, INC | 37,372 | 1.03 |
| HDSN | HUDSON SECURITIES | 32,164 | 0.88 |
| MLCO | MERRILL LYNCH | 30,464 | 0.84 |
| WMBU | WFG INVESTMENT INC. | 28,700 | 0.79 |
| RBCM | RBC CAPITAL MARKETS | 22,962 | 0.63 |
| AGED | A. G. EDWARDS & SONS, INC. | 22,508 | 0.62 |
| RBDA | | 19,600 | 0.54 |
| INCA | INSTINET CORPORATION | 17,838 | 0.49 |
| OPCO | OPPENHEIMER & CO. INC. | 13,969 | 0.38 |
| WEDB | WEDBUSH MORGAN SECURITIES INC. | 13,755 | 0.38 |
| SUSQ | SUSQUEHANNA CAPITAL GROUP | 11,700 | 0.32 |
| ETRS | E*TRADE CLEARING LLC | 10,695 | 0.29 |
| DCSD | DAIN CORRESPONDENT SERVICES | 10,665 | 0.29 |
| TORC | JERICHO INVESTMENTS, LLC | 10,040 | 0.28 |
| JPMS | J.P. MORGAN SECURITIES INC. | 9,085 | 0.25 |
| GNDT | GENESIS SECURITIES, LLC | 8,950 | 0.25 |
| FMAT | FIMAT USA, INC. | 7,800 | 0.21 |
| BARD | ROBERT W. BAIRD & CO. INCORPOR | 7,365 | 0.2 |
| SSIC | SCOTTRADE, INC. | 7,355 | 0.2 |
| FCCP | FIRST CLEARING, LLC | 5,116 | 0.14 |
| EDJO | EDWARD D. JONES & CO., L.P. | 5,100 | 0.14 |
| WEDW | | 5,000 | 0.14 |
| BNPB | BNPB | 4,260 | 0.12 |
| EBXL | EBX LLC | 3,300 | 0.09 |
| FFSI | FIRSTRADE SECURITIES INC. | 2,892 | 0.08 |
| IDSI | AMERICAN ENTERPRISE INVESTMENT | 2,800 | 0.08 |
| KRSH | KRSH | 2,100 | 0.06 |
| BISH | BISHOP ROSEN AND CO. | 1,990 | 0.05 |
| RAGN | WELLS FARGO INVESTMENTS, LLC | 1,850 | 0.05 |
| ROTH | ROTH CAPITAL PARTNERS, LLC | 1,700 | 0.05 |
| LEHM | BARCLAYS CAPITAL INC. | 1,675 | 0.05 |
| YLPL | LINSCO/PRIVATE LEDGER CORP. | 1,621 | 0.04 |
| SHON | SCHONFELD SECURITIES, LLC | 1,355 | 0.04 |
| SWST | SOUTHWEST SECURITIES, INC. | 1,280 | 0.04 |
| UNEX | UNX, INC. A DELAWARE CORPORATI | 1,200 | 0.03 |
| SUBE | SUBERT SECURITIES INC. | 1,100 | 0.03 |
| FILL | TRADESTATION SECURITIES, INC. | 1,000 | 0.03 |
| FTBR | FOLIOFN INVESTMENTS, INC. | 900 | 0.02 |
| NEUB | NEUBERGER BERMAN, LLC | 800 | 0.02 |
| DART | Dallas Research & Trading, Inc. | 798 | 0.02 |
| GLBT | GlobalVest Group, Inc. | 633 | 0.02 |
| EZOP | | 600 | 0.02 |
| PFSP | PENSON FINANCIAL SERVICES, INC | 600 | 0.02 |
| PRST | MERRILL LYNCH PRO CLEARING COR | 500 | 0.01 |
| TDSC | TRACK DATA SECURITIES CORP. | 500 | 0.01 |
| BALE | BALENTINE & COMPANY | 374 | 0.01 |
| PXCO | PAX CLEARING CORPORATION | 300 | 0.01 |
| WBLR | WILLIAM BLAIR & COMPANY L.L.C. | 300 | 0.01 |
| OTAA | OTA LLC | 257 | 0.01 |
| MLTD | | 200 | 0.01 |
| FSWC | FIRST SOUTHWEST CO. | 125 | 0 |
| ZONE | ZONE TRADING PARTNERS | 100 | 0 |
| SOLA | SOLARIS SECURITIES, INC. | 22 | 0 |